UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

U.S. D.I.D. CORP.,

          Plaintiff,

     -v-

WINDSTREAM COMMUNICATIONS, INC.,

          Defendant.

-------------------------------------------------------------------X

| USDC SDNY |
| --- |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: |
| DATE FILED: 1/7/13 |

12 Civ. 4023 (JMF)

OPINION AND ORDER

JESSE M. FURMAN, United States District Judge:

On May 21, 2012, the day this case was filed, Plaintiff U.S. D.I.D. Corporation ("U.S. D.I.D.") obtained an *ex parte* temporary restraining order ("TRO") barring Defendant Windstream Communications, Inc. ("Windstream") from terminating its telecommunications services. Pursuant to Rule 65(c) of the Federal Rules of Civil Procedure, U.S. D.I.D. was required to post security in the amount of $314,672.80. Approximately one month later, just one day after the Court denied U.S. D.I.D.'s motion for a preliminary injunction and vacated the TRO, U.S. D.I.D. voluntarily dismissed its Complaint without prejudice pursuant to Rule 41(a) of the Federal Rules of Civil Procedure. The question presented now is whether Windstream is entitled to a portion of the injunction bond to compensate for damages it sustained as a result of the TRO — specifically, to pay for the services it continued to provide U.S. D.I.D.

The Court first addressed that question in an Opinion filed on July 13, 2012 (the "July 13, 2012 Opinion"), in which it ruled that the denial of the preliminary injunction and vacatur of the TRO sufficed to show that Windstream had been "wrongfully enjoined" within the meaning of Rule 65(c) and that it was therefore entitled to recover on the bond. (Docket No. 37). Upon reconsideration, the Court concludes that that ruling was in error because an enjoined party may recover on an injunction bond only where there has been a final adjudication on the merits.

Nevertheless, on the facts of this case, the Court holds that U.S. D.I.D.'s voluntary dismissal of the Complaint constitutes a final adjudication on the merits for purposes of Rule 65(c). Accordingly, the Court reaches the same conclusion that it reached in the July 13, 2012 Opinion — namely, that Windstream was "wrongfully enjoined" within the meaning of Rule 65(c) and therefore may recover a portion of the injunction bond — albeit for different reasons.  To the extent the July 13, 2012 Opinion is inconsistent with this Opinion, it is hereby vacated.

## BACKGROUND

On May 21, 2012, U.S. D.I.D., a reseller of interstate telecommunications services, filed this action against Windstream, a common and local exchange carrier, alleging claims for breach of contract and violations of the Communications Act, 47 U.S.C. §§ 151 *et seq.*, based on Windstream's efforts to: (1) restrict and otherwise discriminate against the transmission of U.S. D.I.D.'s telecommunications traffic; (2) restrict U.S. D.I.D.'s ability to resell the services it purchased from Windstream; (3) increase the rates Windstream charged U.S. D.I.D. above those listed in the contract; and (4) ultimately terminate U.S. D.I.D.'s services upon insufficient notice. (Compl. ¶¶ 78-115).  On the same date, U.S. D.I.D. moved for a TRO and an Order to Show Cause why a preliminary injunction should not be granted to prevent Windstream from terminating its telecommunications services effective that night at 11:59 p.m. (Docket No. 21). Windstream threatened to terminate U.S. D.I.D.'s services on the ground that U.S. D.I.D. was reselling those services in violation of an express provision prohibiting resale in the retail customer contract between the parties.  Plaintiff contended that the prohibition on resale was and is unenforceable as a violation of the Communications Act or, in the alternative, on grounds of estoppel or waiver.

2

That same evening, the Court issued a TRO requiring Windstream to continue providing U.S. D.I.D. with telecommunications services, and subsequently scheduled a preliminary injunction hearing for June 4, 2012. (Docket Nos. 4, 51). Pursuant to Rule 65(c), the Court also required Plaintiff to post security in the amount of $314,672.80, amounting to twice the charges on the most recent monthly invoice it had received from Windstream. (Docket No. 4). On June 4, 2012, the Court began, but did not finish, the preliminary injunction hearing. At the end of that day's proceedings, the Court orally modified the TRO to permit Windstream to charge U.S. D.I.D. at the standard rates for reseller, rather than retail, customers, effective June 1, 2012 (as Windstream had previously demanded if U.S. D.I.D. had wanted to avoid termination). In addition, the Court scheduled the hearing to conclude on June 21, 2012. (Docket No. 27). These rulings were memorialized in an order the following day. (Docket No. 25).

U.S. D.I.D. failed to appear at the appointed time for the continuation of the hearing, delaying the proceedings for several hours. At the conclusion of the hearing on June 21, 2012, the Court issued an oral ruling on the record denying U.S. D.I.D.'s motion for a preliminary injunction and vacating the TRO. (June 21, 2012 Tr.; *see also* Docket No. 31). The Court held that any harm Plaintiff faced was a result of its own failure to obtain a new service provider, and found that it was likely that the reselling prohibition in the parties' contract did not violate the Communications Act, that the reselling prohibition was a material term of the contract, that Windstream had not waived enforcement of that provision, and that Plaintiff by its own admission had breached that term. On the basis of these findings, the Court ruled that Plaintiff had failed to demonstrate either a likelihood of success on the merits or the existence of sufficiently serious questions going to the merits to make them a fair ground for litigation. (June 21, 2012 Tr. 16). The Court then asked defense counsel whether there would be any objection to

3

return of the security posted by U.S. D.I.D. while the case continued. (*Id.* at 17). Counsel

responded: "No objection, your Honor, considering you are dissolving the TRO." (*Id.*).

Accordingly, the Court directed Plaintiff's counsel to file a proposed order for the return of the

security. (*Id.*). At defense counsel's request, the Court also extended Windstream's deadline to

file its Answer from that day, June 21, 2012, to the close of business the next day, because U.S.

D.I.D.'s failure to appear for the hearing at the appointed hour had caused defense counsel to

miss their scheduled flight home thereby precluding them from filing their Answer. (*Id.* at 18).

   The next day, U.S. D.I.D. submitted a proposed order for the return of the posted

security. In addition, Plaintiff filed a notice of voluntary dismissal pursuant to Rule

41(a)(1)(A)(i), which it would have been unable to do but for the fact that Windstream had not

yet filed its Answer. (Docket No. 34). Within an hour of Plaintiff's submission of the proposed

order, however, Windstream objected, requesting that a portion of the security be applied to pay

an invoice it had issued to U.S. D.I.D. on June 21, 2012, covering the period from May 14, 2012,

to June 14, 2012. (Docket No. 35). The Court directed Defendant to submit a proposed order

consistent with that request and allowed Plaintiff to submit a letter in response. (Docket No. 35).

Plaintiff did so on June 28, 2012. (Docket No. 36).

   In the July 13, 2012 Opinion, the Court ruled that the Defendant was presumptively

entitled to recover a portion of the posted security on the ground that it had been "wrongfully

enjoined or restrained" within the meaning of Rule 65(c). (July 13, 2012 Opinion 6 (Docket No.

37)). That conclusion, the Court reasoned, followed from the Court's denial of U.S. D.I.D.'s

motion for a preliminary injunction and its vacatur of the TRO. (*Id.* at 6). "The issue of whether

Windstream was wrongfully enjoined," the Court stated, "was determined when the Court ruled

that U.S. D.I.D. had failed to demonstrate either a likelihood of success on the merits or the

4

existence of sufficiently serious questions going to the merits to make them a fair ground for litigation. In light of that conclusion, Windstream should never have been enjoined." (*Id.*). The Court thus held that Windstream was entitled to a presumption in favor of recovery, which could only be rebutted by a "good reason." (*Id.* at 4 (internal quotation marks omitted)). The Court determined that U.S. D.I.D. had failed to offer a good reason. (*Id.*). More specifically, the Court rejected U.S. D.I.D.'s arguments that a finding of "wrongfulness" could not be made until there had been a final decision on the merits and, that in the event that the Court did award damages, such an award would amount to a decision on the merits absent due process. (*Id.* at 4-5).

Although the Court found that Windstream was entitled to a portion of the bond, it also found that Windstream had improperly calculated its damages, and therefore directed Defendant to submit a revised calculation of those damages. (*Id.* at 7). Following Defendant's submission of that information, U.S. D.I.D. requested an opportunity to respond, which the Court granted, specifying that the response was to be limited to issues raised by Windstream's revised calculation. (Docket No. 39). Notwithstanding that limitation, Plaintiff submitted a responsive letter that went well beyond Windstream's revised damages calculation. (Docket No. 40). First, U.S. D.I.D. effectively reiterated its argument that the Court could not properly award damages absent a final decision on the merits of the underlying case. (*Id.* at 2-3). Second, it contended that the Court lacked subject-matter jurisdiction in light of the dismissal of the underlying suit and that Windstream was required to file an independent action pursuant to Title 28, United States Code, Section 1352. (*Id.* at 3).[1]  And third, U.S. D.I.D. questioned the Court's ability to

---

[1]      Section 1352 provides, in relevant part, that "district courts shall have original jurisdiction, concurrent with State courts, of any action on a bond executed under any law of the United States." 28 U.S.C. § 1352.

5

determine damages absent an evidentiary hearing as well as the rates at which Windstream had calculated damages and the fees it had charged to U.S. D.I.D.  (*Id.* at 1-2).

The Court would have been on firm ground striking Plaintiff's letter for failure to comply with the Order limiting its scope.  Nevertheless, the letter prompted the Court to reexamine whether it had erred in holding that Windstream was entitled to the bond even without a final adjudication on the merits.  In a subsequent telephone conference, the Court confessed to some uncertainty on that issue, noting that precedent seemed to point in conflicting directions, especially where, as here, the plaintiff had voluntarily dismissed the action after obtaining injunctive relief.  (July 30, 2012 Tr. 5-7 (Docket No. 44)).  In light of that uncertainty, the Court requested supplemental briefing.  (*Id.* at 15).  In its supplemental brief filed thereafter, U.S. D.I.D. reiterated its argument that damages on an injunction bond cannot be awarded absent a final decision on the merits of the underlying case that establishes the enjoined party's legal right to engage in the enjoined behavior.  (Pl.'s Supp. Mem. of Law. 1-4 (Docket No. 48)).  U.S. D.I.D. did not claim to be entitled to the bond itself; instead, it argued that the Court should hold the bond pending an independent action pursuant to Section 1352.  (*Id.* at 1, 9).[2]  By contrast,

---

[2]    In its supplemental brief, U.S. D.I.D. also renewed its objection to the Court's subject-matter jurisdiction and promised to file a motion to that effect.  It never did so.  In any event, as stated on the record in the July 30, 2012 telephone conference (July 30, 2012 Tr. 3-4), there is no question that the Court retains jurisdiction to adjudicate entitlement to the bond.  *See, e.g.*, *Siegelman v. EPA*, 925 F.2d 385, 388 (11th Cir. 1991) (holding that the district court retained jurisdiction to resolve a dispute over an injunction bond even where the underlying dispute had itself been dismissed for lack of subject-matter jurisdiction); *Va. Plastics Co. v. Biostim Inc.*, 820 F.2d 76, 80 n.5 (3d Cir. 1987) (holding that the district court possessed ancillary jurisdiction over a dispute concerning the disposition of an injunction bond); *Pace v. Ross*, No. 78 Civ. 2515, 1981 U.S. Dist. LEXIS 11351 (S.D.N.Y. Mar. 13, 1981) (finding jurisdiction over a claim to an injunction bond following voluntary dismissal of the underlying action pursuant to Rule 41); *see also* 13-65.1 Moore's Federal Practice — Civil § 65.1.04 ("[D]istrict courts have subject matter jurisdiction over proceedings on a motion under Rule 65.1, as well as over independent actions brought to enforce the liability of a surety . . . ."); 11 Wright & Miller, Federal Practice &

Windstream asserted that it was entitled to a portion of the bond for either of two reasons: first, because the Court's denial of the motion for a preliminary injunction and vacatur of the TRO showed that it had been "wrongfully enjoined"; and second, because U.S. D.I.D.'s voluntary dismissal of the case constituted a final decision on the merits for purposes of awarding damages on the bond.  (Def.'s Supp. Mem. of Law 2-10 (Docket No. 47)).

## DISCUSSION

**A.  Recovery on an Injunction Bond Requires a Final Adjudication on the Merits**

Pursuant to Rule 65(c), a court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  This bond requirement "serves a number of functions." *Nokia*, 645 F.3d at 557; *see also* Erin Connors Morton, Note, *Security for Interlocutory Injunctions Under Rule 65(c): Exceptions to the Rule Gone Awry*, 46 Hastings L.J. 1863, 1865- 72 (1995); Elizabeth Leight Quick, *The Triggering of Liability on Injunction Bonds*, 52 N.C. L. Rev. 1252, 1255-57 (1974).  First, "[i]t assures the enjoined party that it may readily collect damages . . . in the event that it was wrongfully enjoined . . . without further litigation and without regard to the possible insolvency of the plaintiff." *Nokia*, 645 F.3d at 557; *see also* Morton, *supra*, at 1865-67; Quick, *supra*, at 1256.  Second, it "provides the plaintiff with notice of the maximum extent of its potential liability." *Nokia*, 645 F.3d at 557; *see also* Morton,

---

Procedure § 2972 (stating that in actions to recover against injunction bonds, "the district court ha[s] discretion to grant relief in the same proceeding" by means of "an expeditious, summary procedure without the necessity of an independent action"); *cf. Nokia Corp. v. Interdigital, Inc.*, 645 F.3d 553 (2d Cir. 2011) (hearing an appeal from the district court's resolution of a dispute over an injunction bond even though the underlying suit had been dismissed, without questioning its own or the district court's subject-matter jurisdiction).

*supra*, at 1870. And third, "the bond serves to deter rash applications for interlocutory orders and thus avoids wasting the court's time with flimsy applications." Morton, *supra*, at 1867; *see also* Quick, *supra*, at 1256 (stating that the bond requirement "discourage[s] plaintiffs from initiating frivolous injunction suits"). As Justice Stevens has explained, because preliminary injunctive relief "may be granted on a mere probability of success on the merits, generally the moving party must demonstrate confidence in his legal position by posting bond in an amount sufficient to protect his adversary from loss in the event that future proceedings prove that the injunction issued wrongfully." *Edgar v. MITE Corp.*, 457 U.S. 624, 649 (1982) (Stevens, J., concurring in part and concurring in the judgment). Put another way, a party seeking such relief is forced to make "a business judgment that it [is] willing to incur the 'cost' of a possibly wrongful injunction in order to [obtain relief]." *Global NAPs, Inc. v. Verizon New England, Inc.*, 489 F.3d 13, 21 (1st Cir. 2007).

Rule 65.1 establishes procedures for recovering against an injunction bond posted pursuant to Rule 65(c). *See* Fed. R. Civ. P. 65.1. (Although Rule 65.1 on its face applies only to a bond posted by a surety, it is well established that the Rule applies also to bonds posted by a principal. *See, e.g.*, 13-65.1 Moore's Federal Practice — Civil § 65.1.03; *see also Global NAPs*, 489 F.3d at 20 ("Although the terms of Rule 65.1 apply only to sureties, courts have applied that rule's procedures when imposing liability on a principal as well.")). Pursuant to Rule 65.1, the moving party's liability on the security "may be enforced on motion without an independent action." Fed. R. Civ. P. 65.1. Alternatively, an enjoined or restrained party may seek to recover on the bond by bringing an independent action pursuant to Title 28, United States Code, Section 1352, which grants district courts "original jurisdiction . . . of any action on a bond executed under any law of the United States." *See also, e.g., Bass v. First Pac. Networks, Inc.*, 219 F.3d

8

1052, 1054 (9th Cir. 2000) ("The rule, however, is permissive. . . . [L]iability [on an injunction bond] may be enforced under either Rule 65.1's summary procedure or through an independent action [pursuant to Section 1352]."); *see also* 11 Wright & Miller, Federal Practice & Procedure § 2972. In either case, however, the party seeking to recover must show that it was "wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c); *see Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 910 F.2d 1049, 1054-55 (2d. Cir. 1990).

Neither Rule 65 nor Rule 65.1 defines the meaning of "wrongfully enjoined or restrained." In *Blumenthal*, however, the Second Circuit held that "[a] party has been 'wrongfully enjoined' . . . if it is ultimately found that the enjoined party had at all times the right to do the enjoined act." 910 F.2d at 1054; *see also H.E. Fletcher Co. v. Rock of Ages Corp.*, 326 F.2d 13, 16-17 (2d Cir. 1963) (holding that the injunction bond renders the movant "liable for damages if in the end it was determined that [the enjoined party] was within its rights in" engaging in enjoined conduct); *accord* Note, *Recovery for Wrongful Interlocutory Injunctions Under Rule 65(c)*, 99 Harv. L. Rev. 828, 836-42 (1986) ("*Harvard Law Review* Note"). More specifically, "[t]he focus of the 'wrongfulness' inquiry" — as least in this Circuit — "is whether, *in hindsight in light of the ultimate decision on the merits after a full hearing*, the injunction should not have issued in the first instance." *Blumenthal*, 910 F.2d at 1054 (emphasis added); *see also Guzman v. Local 32B-32J, Serv. Emps. Int'l Union, AFL-CIO*, 72 F.3d 260, 263 (2d Cir. 1995) (stating that liability on the injunction bond turns on "the ultimate issue of whether the enjoined party had the legal right to act as it wished"). *But see Global NAPs*, 489 F.3d at 22 n.6 ("Dissolution of an injunction is itself a final determination which permits a party to seek security posted with respect to the injunction."); *Qualcomm, Inc. v. Motorola, Inc.*, 179 F.R.D. 580, 583-84 (S.D. Cal. 1998) (holding that the dissolution of a TRO constitutes a "final judgment

9

on the merits" allowing recovery against the TRO bond).  In fact, the *Blumenthal* Court explained, a claim against the bond "is a separate and distinct claim from the merits of the underlying controversy," and does not even arise "except upon a favorable ruling on the lack of merit to the movant's case." *Blumenthal*, 910 F.2d at 1056.

In light of these principles, the Court's conclusion in the July 13, 2012 Opinion — that the wrongfulness of the TRO was demonstrated by the denial of U.S. D.I.D.'s motion for a preliminary injunction and vacatur of the TRO, without more (July 13, 2012 Opinion 6) — was in error.  After all, the Court did not find that Windstream "had at all times the right to do the enjoined act"; it merely held that U.S. D.I.D. failed to satisfy the requirements for preliminary injunctive relief.  Nevertheless, that does not necessarily dispose of the dispute in this case because, the day after the Court denied the motion for a preliminary injunction and vacated the TRO, U.S. D.I.D. voluntarily dismissed the case (Docket No. 34), thereby preempting an "ultimate decision on the merits after a full hearing." *Blumenthal*, 910 F.2d at 1054.  Had that dismissal been *with* prejudice, the dismissal would — as U.S. D.I.D. concedes (Supp. Mem. 5) — have constituted an adjudication of the dispute on the merits for purposes of recovering on the bond.  *See, e.g.*, *Belfer v. Minko*, No. 05 CV 2473, 2008 WL 163615, at \*2 (N.D. Ohio Jan. 17, 2008) ("[A] voluntary dismissal *with prejudice* serves as a final adjudication on the merits . . . ." (citing *Warfield v. AlliedSignal TBS Holdings, Inc.*, 267 F.3d 538, 542 (6th Cir. 2001))); *see also, e.g.*, *Wainwright Secs. Inc. v. Wall St. Transcript Corp.*, 80 F.R.D. 103, 106 (S.D.N.Y. 1978) (collecting cases).  U.S. D.I.D.'s dismissal, however, was pursuant to Rule 41(a)(1)(A)(i) of the Federal Rules of Civil Procedure, and thus was *without* prejudice.  *See* Fed. R. Civ. P. 41(a)(1)(B).  The question is thus whether, after vacatur of a preliminary injunction or a TRO, a

plaintiff's voluntary dismissal of its complaint without prejudice should be treated as a final decision on the merits sufficient to establish the wrongfulness of the injunction or TRO.

### B. U.S. D.I.D.'s Voluntary Dismissal Constitutes a Final Adjudication on the Merits

Neither the Supreme Court nor the Second Circuit has addressed that question.[3] The majority of courts and commentators, however, have answered it in the affirmative — at least in certain circumstances. The Eighth Circuit's decision in *Middlewest Motor Freight Bureau v. United States*, 433 F.2d 212, 215-17 (8th Cir. 1970), is instructive. In that case, trucking carriers obtained a TRO and sought a preliminary injunction to block the enforcement of an Interstate Commerce Commission ("ICC") order that barred the carriers from charging higher rates. *See id.* at 215-17. The district court, however, denied the motion for a preliminary injunction and dissolved the TRO on the grounds that (1) the carriers had "failed to demonstrate a reasonable probability that the Commission's order would be overturned"; (2) the carriers "had administrative remedies which would enable them to obtain increased rates"; and (3) "the magnitude of the loss to the public, combined with the 'remote possibility' of the carriers' success, justified denial of the interlocutory injunction." *Id.* at 217. Thereafter, the shipper-customers who had intervened to oppose the carriers sought to collect damages on the injunction bond for the higher rates they had been forced to pay under the TRO. *See id.* The carriers, after

---

[3]     Although the Second Circuit has not addressed the question directly, it bears mentioning that the *Blumenthal* Court cited approvingly the *Harvard Law Review* Note, which took the position that, where a plaintiff voluntarily dismisses its complaint, a defendant may be able to recover from the injunction bond notwithstanding the absence of a full adjudication on the merits. *See* 910 F.2d at 1055 (citing *Harvard Law Review* Note, *supra*, at 839). The *Blumenthal* Court also cited a case in which the dissolution of a TRO was held to be a "final decision on the merits" supporting recovery on the TRO bond, even though the underlying merits had not yet been decided. *See id.* at 1055 (citing *Rocky Mountain Timber Corp. v. Fed. Ins. Co.*, 502 F. Supp. 433, 434-35 (D. Or. 1980)).

11

issuing new rate schedules that mooted the underlying case and realizing that they possessed only a "remote possibility" of success in their lawsuit, voluntarily dismissed the case in an effort to avoid liability on the bond. *Id.* at 218. Citing the lack of a definitive finding that the shippers were entitled to the lower rates, the district court denied recovery on the bond and the shippers appealed. On appeal, the carriers reiterated their argument that recovery was inappropriate because there had been no final decision on the merits of the underlying case. *See id.* at 242.

The Eight Circuit rejected that argument and reversed. The Court held, first, that the carriers' argument failed because the ICC order was entitled to a "presumption of validity" and, thus, "was at all times binding upon the carriers until they successfully concluded a suit proving its invalidity." *Id.* at 242. More relevant for present purposes, however, the Court reasoned that "[t]his conclusion is also consistent with the generally adopted position that the voluntary dismissal of an injunction suit by a plaintiff without the consent of the defendant is a determination of the merits of a controversy so as to render the plaintiff and his sureties liable on the injunction bond." *Id.* at 243 (citing *Dismissal of Injunction Action or Bill without Prejudice as Breach of Injunction Bond*, 91 A.L.R.2d 1312 (1963)). "Here," the Court explained, "the carriers by their own actions rendered the issues in the main suit moot and procured the dismissal. They received the benefit of the temporary restraining order without ever proving [the merits of their position]; such proof is a prerequisite to the absolution of liability for those benefits." *Id.*

Notably, in rejecting the carriers' argument that a final judgment on the merits of the underlying case was a prerequisite to the shippers' recovery on the bond, the Court found it

> significant . . . that while there has not been a determination on the merits of the ICC order, there has been a determination that the carriers were not entitled to injunctive relief from the order. The denial of the interlocutory injunction on the

> grounds of the 'remote possibility' of the carriers' success on the merits is clearly
> a decision that the carriers should be required to comply with the Commission
> order until they successfully completed a suit against it. . . . Where a party fails to
> prove grounds sufficient for the grant of an interlocutory injunction, he at the
> same time shows that the temporary restraining order should not have been
> granted, at least to the extent of rendering him liable in restitution for benefits
> received under the temporary restraining order.

*Id.* Thus, the Court concluded, "the failure to carry the burden of proof on the interlocutory

injunction shows that the temporary restraining order should not have been issued, in the absence

of a later decision in the carriers' favor on the merits." *Id.*

Strictly speaking, the portion of *Middlewest* addressing the effect of the carriers'

voluntary dismissal of their complaint is dictum. *See, e.g.*, *Belfer*, 2008 WL 163615, at *2.

Nevertheless, several courts — including two in this District — have followed *Middlewest* in

concluding that a plaintiff's voluntary dismissal without prejudice can serve as a final

determination on the merits so as to render the plaintiff liable on an injunction bond. *See id.*;

*Almoss v. Furman*, No. 06 Civ. 8243 (LLS), 2007 WL 1975571, at *1-2 (S.D.N.Y. July 6, 2007);

*Mail Boxes Etc., Inc. v. PBC Servs., Inc.*, No. 4:06CV00188 GH, 2007 WL 841664, at *4 (E.D.

Ark. Mar 15, 2007); *LaSalle Capital Grp., Inc. v. Alexander Doll Co.*, No. 95-cv-1640, 1995

U.S. Dist. LEXIS 14338, at *4-5 (N.D. Ill. Sept. 28, 1995); *Pace*, 1981 U.S. Dist. LEXIS 11351,

at *3-6. Commentators are in accord. *See, e.g.*, 11 Wright & Miller, Federal Practice &

Procedure § 2972 ("A voluntary dismissal or abandonment of the request of injunctive relief, if it

comes after a temporary restraining order has been granted . . . has the same effect as a final

decision that the parties seeking the injunction were not entitled to it."); *accord Harvard Law

Review* Note, *supra*, at 839; Quick, *supra*, at 1268; *see also Dismissal of Injunction Action or

Bill without Prejudice as Breach of Injunction Bond*, 91 A.L.R.2d 1312 (1963). Whether a

plaintiff's voluntary dismissal should serve that function, however, "must be made on a case by

13

case basis." *Belfer*, 2008 WL 163615, at \*2 (citing *LaSalle*, 1995 U.S. Dist. LEXIS 14338, at \*10); *accord* Quick, *supra*, at 1267; *cf. Pace*, 1981 U.S. Dist. LEXIS 11351, at \*6.

In *LaSalle*, for example, the plaintiff obtained a TRO to enforce a negotiating exclusivity agreement with the defendant. *See* 1995 U.S. Dist. LEXIS 14338, at \*4-5. Once it became clear that LaSalle could not perform under the contract, however, the district court denied its application for a preliminary injunction and dissolved the TRO. *See id.* at \*5. The defendant subsequently declared bankruptcy, leading LaSalle to voluntarily dismiss the case and seek return of the security it had posted to obtain the TRO. *See id.* at \*5-6. The district court held that LaSalle could not reclaim the bond because the defendant was entitled to an opportunity to litigate the wrongfulness of the injunction. *See id.* at \*7-9. At the same time, notwithstanding the Court's "agree[ment]" with *Middlewest* "that where a party seeking a TRO 'rendered the issues in the main suit moot and procured [a] dismissal[,] they received the benefit of the temporary restraining order without ever proving the [order] invalid,'" the Court declined to treat LaSalle's voluntary dismissal as "an adjudication that the TRO was wrongly entered." *Id.* at \*10 (alteration in original) (quoting *Middlewest*, 433 F.2d at 243). "[B]y the time LaSalle dismissed its suit," the Court reasoned, the defendant

> had already entered bankruptcy and had been sold; thus the principal reason for its suit — an injunction requiring [the defendant] to negotiate exclusively with it — had disappeared. We are not willing to go so far, therefore, to say that LaSalle's voluntary dismissal constitutes an adjudication, or even an admission by LaSalle that the TRO was wrongfully entered.

*Id.*

Based on the totality of the circumstances, the Court reached a similar conclusion in *Belfer*. In that case, the plaintiffs had obtained a TRO, but the hearing on their motion for a preliminary injunction never occurred because of settlement negotiations. *See* 2008 WL 163615,

14

at *1. Almost two years later, the plaintiffs moved for release of the security. *See id.* After the Court denied their motion, the plaintiffs voluntarily dismissed their case — pursuant to Rule 41(a), and thus without prejudice, as the defendants had never filed an answer — and both the plaintiffs and the defendants claimed entitlement to the security. *See id.* at *1-2. The Court distinguished *Middlewest* on the ground that the Eighth Circuit had "found it significant that while there had not been a determination on the merits, there had been a determination that the plaintiffs were not entitled to injunctive relief." *Id.* at *2 (citing *Middlewest*, 433 F.2d at 243). Relying on *LaSalle* for the proposition that "a determination of whether a voluntary dismissal serves as a final determination on the merits must be made on a case by case basis," the Court concluded that, "[o]n the facts of this case, because there has been no determination that plaintiffs were not entitled to injunctive relief, the logic of *Middlewest* is not persuasive." *Id.* (citing *LaSalle*, 1995 U.S. Dist. LEXIS 14338, at *10).

Quoting from Judge Connor's decision in *Pace*, the *Belfer* Court acknowledged that the defendants had raised a "valid policy concern" insofar as "[a] plaintiff who voluntarily dismisses an action after a temporary restraining order has been issued reaps the benefit of the injunction and, at the same time, deprives the defendant of an opportunity to establish that the injunction ought not to have been granted." *Id.* (quoting *Pace*, 1981 U.S. Dist. LEXIS 11351, at *16) (internal quotation marks omitted). Yet the Court distinguished the facts from those in *Pace*, where "plaintiffs filed their complaint and motion for a TRO to enjoin a meeting that was scheduled to take place that same day, giving rise to an inference that plaintiffs sought the TRO to harm defendants." *Id.* (citing *Pace*, 1981 U.S. Dist. LEXIS 11351, at *4-6, 20). "[T]he risk of a plaintiff abusing the TRO process by obtaining a TRO and then voluntarily dismissing the case," the *Belfer* Court explained, "is most pronounced during the early stages of litigation when

15

defendant has not had an opportunity to answer or otherwise defend the lawsuit.  Here, however, the timing of the filing of the lawsuit and the motion for a TRO" — not to mention the defendants' "ample opportunity to answer or otherwise defend the lawsuit" in the two years it had been pending — "do not support an inference that plaintiffs obtained the TRO for malicious purposes." *Id.*

In short, these cases support the proposition that, at least in certain circumstances, a plaintiff's voluntary dismissal of its complaint may be treated as a final adjudication on the merits for purposes of Rule 65(c).  Conspicuously, U.S. D.I.D. cites no authority to the contrary, and the Court's own research has revealed only one case that comes close: Judge Lasker's decision in *Wainwright Securities*.  In that case, the Court had granted an injunction barring the Wall Street Transcript (the "Transcript"), a financial weekly newspaper, from publishing abstracts of Wainwright's copyrighted research reports.  *See* 80 F.R.D. at 104.  After the preliminary injunction was affirmed on appeal, however, Wainwright ceased doing business and moved to dismiss its suit with prejudice pursuant to Rule 41(a)(2).  *See id.*  The Transcript opposed the motion, contending that it would be prejudiced by the dismissal because it would have to bring an independent action on the bond to recover for the injuries it allegedly suffered as a result of the preliminary injunction.  *See id.* at 106.  Judge Lasker rejected the argument, reasoning that the Transcript would not have to bring an independent action to recover on the bond because dismissal *with* prejudice "has the effect of a final adjudication on the merits favorable to the defendant."  *Id.*  By contrast, the Court stated, "[i]f Wainwright were seeking a dismissal *without* prejudice, the Transcript's argument would *surely have merit*."  *Id.* (emphases added) (citing *Am. Bible Soc'y v. Blount*, 446 F.2d 588, 594-95 & 595 n.12 (3d Cir. 1971), and *Meyers v. Jay St. Connecting R.R.*, 288 F.2d 356, 358 (2d Cir. 1961)).

16

On its face, this last statement could be read to mean that a plaintiff's voluntary dismissal *without* prejudice, as in this case, can never give rise to liability on an injunction bond.  The Court declines to rely on the statement for that proposition, however, for at least four reasons.  First, it flies in the face of the overwhelming weight of authority discussed above.  Second, it is plainly dictum, as the dismissal in *Wainwright* was with prejudice, and the Court did not need to address the effect, if any, of dismissal without prejudice to reach its conclusion.  Third, the cases cited by the *Wainwright* Court — *American Bible Society* and *Meyers* — simply do not support such a categorical statement.  In the former, the Court did "adopt the rule that a final judgment is a prerequisite to recovery" on an injunction bond, but it did so only in a footnote and, even more important, expressly limited its holding to the "record" in the case.  *See* 446 F.2d at 595 n.12.  And the latter case, by contrast, had nothing whatsoever to do with dismissal of a suit, either with or without prejudice; instead, it addressed the question of whether a suit is moot where the underlying dispute has been resolved, but the parties continue to dispute liability on an injunction bond.  *See* 288 F.2d at 358-60.  Finally, the *Wainwright* Court itself went on to rely on *Middlewest* and Wright & Miller for the proposition that "[t]he generally adopted position [is] that the voluntary dismissal of an injunction suit by a plaintiff without the consent of the defendant is a determination of the merits of the controversy so as to render the plaintiff . . . liable on the injunction bond."  80 F.R.D. at 106 (quoting *Middlewest*, 433 F.2d at 243, and citing 11 Wright & Miller § 2972, at 649).

For all of these reasons, the Court holds that a plaintiff's voluntary dismissal of its suit pursuant to Rule 41(a) after it has sought and received a TRO or a preliminary injunction can constitute a final adjudication on the merits that "the injunction should not have issued in the first instance."  *Blumenthal*, 910 F.2d at 1054.  The determination of whether such a dismissal should

17

be treated as a final adjudication on the merits for such purposes, however, "must be made on a case by case basis" in light of the totality of the circumstances. *Belfer*, 2008 WL 163615, at *2. A key factor in this analysis is whether, as here, the plaintiff's dismissal follows vacatur of the TRO or injunction on the ground that the plaintiff has failed to show a likelihood of success on the merits. *See Middlewest*, 433 F.2d at 243; *Belfer*, 2008 WL 163615, at *2; *cf. Rocky Mountain Timber Corp.*, 502 F. Supp. at 434-35 (holding that dissolution of a TRO after the plaintiff failed to carry its burden at the preliminary injunction hearing constituted "a final decisions on the merits" for purposes of the bond). In such circumstances, a court may "presume that the defendant had the right to engage in the activity prohibited by the injunction. This presumption is justified because plaintiffs voluntarily dismiss usually on the basis of a belief that they will lose on the merits." *Harvard Law Review* Note, *supra*, at 839. By contrast, such a presumption is likely unwarranted where the TRO or preliminary injunction was in effect at the time of dismissal or where a court vacated the TRO on grounds unrelated to the merits of the suit, such as a failure to show irreparable harm. *Cf. id.* at 839-41.

Several other factors are relevant to the analysis as well. First, a court should consider whether the plaintiff's voluntary dismissal occurs early in the case or after substantial litigation. As the *Belfer* Court explained, "the risk of a plaintiff abusing the TRO process by obtaining a TRO and then voluntarily dismissing the case is most pronounced during the early stages of litigation when defendant has not had an opportunity to answer or otherwise defend the lawsuit." *Belfer*, 2008 WL 163615, at *2; *see also Pace*, 1981 U.S. Dist. LEXIS 11351, at *4-6, 16-17. Second, a court must consider whether the defendant had notice of, or even consented to, the plaintiff's voluntary dismissal, as dismissal, "if consented to by the other party, precludes proceeding against the bond." 11 Wright & Miller, Federal Practice & Procedure § 2972; *accord*

18

*Janssen v. Shown*, 53 F.2d 608, 610-11 (9th Cir. 1931); *see also, e.g.*, *Pace*, 1981 U.S. Dist. LEXIS 11351, at *18 (deferring decision on whether to treat the plaintiff's voluntary dismissal as a final adjudication on the merits in light of "a genuine issue of material fact . . . with respect to whether defendants consented" to the voluntary dismissal). Finally, the court should evaluate whether there are other reasons that might explain the plaintiff's dismissal aside from a belief that it would likely lose on the merits, such as mootness or a party's bankruptcy. *See, e.g.*, *LaSalle*, 1995 U.S. Dist. LEXIS 14338, at *10 (declining to treat a voluntary dismissal after the defendant had filed for bankruptcy as a final adjudication on the merits); *see also* Quick, *supra*, at 1268-69 (explaining that voluntarily dismissal does not constitute a final adjudication on the merits where it "comes about because of circumstances arising after the issuance of the injunction where the original injunction was proper"). The ultimate touchstone of the analysis is whether the circumstances justify drawing an inference that the plaintiff's voluntary dismissal was based on a belief that the plaintiff was unlikely to succeed on the merits. If they do, a court may presume that "the enjoined party had at all times the right to do the enjoined act" and, therefore, that the injunction was "wrongful" within the meaning of Rule 65(c). *Blumenthal*, 910 F.2d at 1054; *cf. Harvard Law Review* Note, *supra*, at 839 ("When a plaintiff voluntarily dismisses her suit, a court . . . should presume that the defendant had the right to engage in the activity prohibited by the injunction. This presumption is justified because plaintiffs voluntarily dismiss usually on the basis of a belief that they will lose on the merits.").

Significantly, this test is consistent not only with the weight of authority, discussed above, but also with two of the underlying purposes of the bond requirement: assuring the enjoined party "that it may readily collect damages . . . in the event that it was wrongfully enjoined . . . without further litigation and without regard to the possible insolvency of the

19

plaintiff," *Nokia*, 645 F.3d at 557; and deterring "rash" or "flimsy" applications for preliminary

injunctive relief, Morton, *supra*, at 1867; *see also Coyne-Delany v. Capital Dev. Bd.*, 717 F.2d

385, 391-92 (7th Cir. 1983). After all, applying a strict "final judgment" rule in circumstances

where a plaintiff has dismissed its suit to avoid an adjudication on the merits "would allow a

plaintiff to bring a suit for injunctive relief either knowing that its claim was without merit, or

realizing later that it had no merit, dismiss the suit, and thereby avoid any consequences for

damages suffered by the enjoined party as a result of the wrongly entered injunction." *LaSalle*,

1995 U.S. Dist. LEXIS 14338, at *9. It is true that the defendant in such circumstances could

bring an independent action on the bond pursuant to Section 1352. But requiring defendants to

do so in all cases would hardly "assure[]" that they could "readily collect damages . . . without

further litigation." *Nokia*, 645 F.3d at 557. Moreover, where a plaintiff who has voluntarily

dismissed its suit without prejudice is held liable for an injunction bond on that basis, it too has a

remedy if it truly believes that the defendant had been enjoined properly: It may refile its suit,

prove its claims, and recover the bond in the form of damages. And insofar as the burdens of

pursuing the matter must be imposed on one party or the other, it makes good sense to impose

them on the plaintiff, as the party that obtained injunctive relief in the first place and made "a

business judgment that it was willing to incur the 'cost' of a possibly wrongful injunction in

order to [obtain such relief]." *Global NAPs*, 489 F.3d at 21.

     Applying the foregoing test to the facts of this case, the Court has little trouble

concluding that U.S. D.I.D.'s voluntary dismissal should be treated as a final adjudication on the

merits justifying a finding that Windstream was "wrongfully" restrained by the TRO. First and

foremost, U.S. D.I.D. dismissed the suit promptly after the Court denied its motion for a

preliminary injunction and vacated the TRO. Further, as in *Middlewest*, the Court's ruling was

based on a finding that U.S. D.I.D. was unlikely to succeed on the merits of its claims and that

there were not sufficiently serious questions going to the merits of those claims.  Second, U.S.

D.I.D. obtained the TRO *ex parte* on the same day it filed its Complaint and dismissed the

Complaint only one month later, less than twenty-four hours after the Court denied the motion

for a preliminary injunction and vacated the TRO and only hours before Windstream was due to

file its Answer.  (Docket No. 29).[4]  This timing makes it more likely that U.S. D.I.D.

intentionally used the judicial process to "reap[] the benefit of the injunction" while also

"depriv[ing] the defendant of an opportunity to establish that the injunction ought not to have

been granted."  *Pace*, 1981 U.S. Dist. LEXIS 11351, at *16.[5]  Third, there is no evidence that

Windstream was on notice of, let alone consented to, U.S. D.I.D.'s dismissal.  And fourth, there

are no extenuating circumstances — such as mootness or bankruptcy — that would suggest U.S.

D.I.D. dismissed the case for a reason other than a belief that it would not ultimately succeed on

the merits.  In short, all of the relevant factors support the conclusion that U.S. D.I.D. dismissed

---

[4]      Remarkably, U.S. D.I.D. suggests that Windstream is partially to blame for the present dispute because its "strategic decision not to file an answer until after the preliminary injunction hearing" enabled U.S. D.I.D. to dismiss its complaint without prejudice as a matter of right. (Pl.'s Supp. Mem. of Law 5).  Of course, Windstream would have filed its Answer on June 21, 2012, the date the preliminary hearing resumed, but for the fact that U.S. D.I.D. failed to appear at the appointed hour, causing defense counsel to miss their flight.  (June 21, 2012 Tr. 18).

[5]      There are other circumstances in this case that raise an inference of bad faith on the part of U.S. D.I.D.  In particular, this is not the first time that Dean Vlahos, the President of U.S. D.I.D., has been accused of reselling telecommunications services in violation of a contract provision like the one at issue in this case.  Only a few years ago, another corporate entity owned and controlled by Vlahos was sued by its telecommunications provider for breach of contract on that basis.  *See Global Crossing Telecomms., Inc. v. CCT Commc'ns, Inc.* (In re *CCT Commc'ns, Inc.*), 464 B.R. 97, 102-03 (Bankr. S.D.N.Y. 2011).  Vlahos's company prevented the provider in that case from terminating its services by filing for bankruptcy, and ultimately brought counterclaims that in many respects are identical to its claims in this proceeding.  *See id.* at 102-03.  That is to say, Vlahos was on notice when he negotiated and signed the contract with Windstream that it did not necessarily permit him to resell services.

21

its suit "on the basis of a belief that [it would] lose on the merits." *Harvard Law Review* Note, *supra*, at 839. Accordingly, on the facts of this case, that dismissal is appropriately considered "an adjudication" by U.S. D.I.D. "that the TRO was wrongfully entered." *LaSalle*, 1995 U.S. Dist. LEXIS 14338, at *10.

As noted, that conclusion in no way precludes U.S. D.I.D. from endeavoring to prove that Windstream was properly restrained and, if it were to succeed in that endeavor, from reclaiming the portion of the bond awarded to Windstream in these proceedings. After all, U.S. D.I.D.'s dismissal of its suit was without prejudice, so it may refile its claims in this Court or elsewhere. If it does, and if it proves that Windstream was not lawfully allowed to terminate its services, U.S. D.I.D. would presumably be entitled to recover the amount awarded to Windstream from the injunction bond. At least in the circumstances of this case, where Plaintiff voluntarily dismissed its case after the Court denied its motion for a preliminary injunction and vacated a TRO for failure to show a likelihood of success on the merits, and where there are signs of intentional manipulation of the legal process, it makes more sense to put that onus on U.S. D.I.D. than to require Windstream to file a new lawsuit pursuant to Section 1352. Accordingly, and notwithstanding the error in the July 13, 2012 Opinion, the Court concludes that Windstream was "wrongfully enjoined or restrained" within the meaning of Rule 65(c). Further, because — for the reasons discussed in the July 13, 2012 Opinion — U.S. D.I.D. has failed to show any "good reason" to deny recovery against the bond (*see* July 13, 2012 Opinion 4-7), Windstream is entitled to recover a portion of the injunction bond.

## C. Calculation of Windstream's Damages

That leaves calculation of Windstream's damages proximately caused by the TRO. *See Nokia*, 645 F.3d at 559 (stating that for an enjoined party to recover from an injunction bond, it

must both "properly substantiate the damages sought" and demonstrate that they "were proximately caused by the wrongful injunction"). In the July 13, 2012 Opinion, the Court required Windstream to submit a revised calculation of its damages that covered only the period of the TRO — that is, a calculation excluding any amounts owed for services prior to May 22, 2012, and including any amounts owed for services through June 21, 2012. On July 23, 2012, Defendant e-mailed the Court a Declaration of John Reed providing that revised calculation. (Docket No. 43). Pursuant to this Court's Order, for the period from May 22, 2012, to May 31, 2012, Defendant was allowed to charge Plaintiff at a .013 per minute rate, and from June 1, 2012, to June 21, 2012, it was allowed to charge at the standard wholesale rates set forth in a letter Defendant provided Plaintiff dated March 27, 2012. (Aug. 16, 2012 Reed Decl. ¶¶ 2, 7 (Docket No. 46)). Although the Court recognizes that U.S. D.I.D. contests these rates and views them as unlawful, the Court finds that these are the rates Windstream would have charged U.S. D.I.D. to continue services in the absence of the TRO and, therefore, that they provide an appropriate basis for the calculation of damages. The Court has reviewed the revised calculation and finds that the attached invoices provide a sufficient evidentiary basis on which to award damages. *See Global NAPs*, 489 F.3d at 24-25 (awarding damages on an injunction bond to a telecommunications firm on the basis of affidavits and billing records in lieu of an evidentiary hearing).

As a final matter, U.S. D.I.D. contends that Windstream's calculation of damages improperly includes charges for contributions to the Universal Service Fund ("USF"), because U.S. D.I.D. had filed the relevant paperwork to become a USF contributor in April 2012. (Pl.'s

23

June 28, 2012 Letter at 5 (Docket No. 36); Pl.'s July 24, 2012 Letter at 1 (Docket No. 40)).[6]   In

response to this argument, Defendant submitted a letter on August 17, 2012, which included as

an exhibit an FCC record indicating that while U.S. D.I.D. did register as a reseller, it was *not*

then a contributor to the USF, notwithstanding its representations to the contrary in this Court.

(Docket No. 50).  U.S. D.I.D. has had ample opportunity to respond to this letter and has chosen

not to do so.  Accordingly, the Court will not question Defendant's decision to apply USF fees to

Plaintiff's invoices and will not reduce the damages on that basis.  If there is an error in the

FCC's records, Plaintiff can presumably obtain a refund from the FCC.  Accordingly, consistent

with the revised calculations set forth in the Declaration of John Reed dated July 20, 2012, the

Court awards Windstream $227,271.92 from the posted security.  (*See* July 20, 2012 Reed Decl.

¶ 7 (Docket No. 43); *id.* Exs. A & B).

## CONCLUSION

For the foregoing reasons, the Court's July 13, 2012 Opinion is vacated to the extent it

held that an enjoined party may recover on an injunction bond in the absence of a final

adjudication on the merits.  Nevertheless, the Court concludes that U.S. D.I.D.'s voluntary

dismissal of its complaint on June 22, 2012, constitutes a final adjudication on the merits for

these purposes and, thus, reaffirms its finding — albeit on different grounds — that Windstream

---

[6]     Federal Communications Commission ("FCC") regulations require a carrier to treat a
reseller who does not contribute to the USF fund as an end user, require the carrier to make
contributions to the USF fund based on that reseller's operations, and authorize the carrier to
apply surcharges to that reseller's bills.  *See* 47 C.F.R. § 54.711(a); FCC, 2012 FCC Form 499-A
Telecommunications Reporting Worksheet (Reporting 2011 Revenues) Lines 420, 511,
http://transition.fcc.gov/Daily_Releases/Daily_Business/2012/db0328/DOC-313284A1.pdf;
FCC, 2012 Telecommunications Reporting Worksheet Instructions (FCC Form 499-A) 4,
http://transition.fcc.gov/Forms/Form499-A/499a-2012.pdf.

was "wrongfully" restrained by the TRO.  Accordingly, and for the reasons stated above, the Court awards Windstream $227,271.92 for damages caused by the TRO.

By letter application, U.S. D.I.D. requested that any release of funds to Windstream be delayed fourteen days to give it the opportunity to file a motion to alter or amend or to seek a stay pending appeal.  (Docket No. 40).  Given that the Second Circuit has not addressed the issue discussed in this Opinion and that the Opinion will function as a final judgment that U.S. D.I.D. is liable on the injunction bond (absent future proceedings between the parties), the Court will and hereby does grant Plaintiff's request and stays any release of funds for fourteen days.

Accordingly, on January 22, 2013, the Clerk of the Court shall issue a check payable to Windstream Communications, Inc., in the amount of $227,271.92, which is to be drawn from the $314,672.80 deposited by U.S. D.I.D. in the Court's registry, and shall mail that check to Windstream's counsel, Brian J. Butler, Esq., at Bond, Schoeneck & King, PLLC, One Lincoln Center, Syracuse, NY 13202.  On that same date, the Clerk of the Court shall issue a check payable to U.S. D.I.D. Corporation for the remaining $87,400.88 deposited by U.S. D.I.D. in the Court's registry, and shall mail that check to Dean Vlahos, President of U.S. D.I.D., at 640 Federal Road, Brookfield, CT 06804.

SO ORDERED.

Dated: January 7, 2013
      New York, New York

JESSE M. FURMAN
United States District Judge